GooIN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MAXINE JACQUEZ,

      Plaintiff,

v.                                                            No. CIV-16-282 LAM-GJF

NANCY A. BERRYHILL, Acting Commissioner
of the Social Security Administration,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff's ***Motion to Reverse and Remand for a Rehearing With Supporting Memorandum*** (*Doc. 21*), filed December 1, 2016 (hereinafter "motion"). On January 23, 2017, Defendant filed a response (*Doc. 23*) to Plaintiff's motion and, on February 7, 2017, Plaintiff filed a reply (*Doc. 24*). In accordance with 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(b), the parties have consented to have the undersigned United States Magistrate Judge conduct all proceedings and enter a final judgment in this case. *See* [*Doc.* 25]. The Court has considered Plaintiff's motion, Defendant's response, Plaintiff's reply, and the relevant law. Additionally, the Court has meticulously reviewed and considered the entire administrative record. [*Doc. 13*]. For the reasons set forth below, the Court **FINDS** that Plaintiff's motion should be **DENIED** and the decision of the Commissioner of the Social Security Administration (hereinafter "Defendant") should be **AFFIRMED**.

      .

# I.   Procedural History

On April 20, 2009, Plaintiff protectively filed an application for Disability Insurance Benefits (hereinafter "DIB"), alleging disability that began on May 31, 2008.   [*Doc. 13-8* at 19]. Plaintiff's application was denied at the initial level on September 17, 2009 (*Doc. 13-4* at 2) and, at the reconsideration level, on March 10, 2010 (*id.* at 3).   Plaintiff requested a hearing to review the denial of her application (*Doc. 13-5* at 13), and Administrative Law Judge Barry Robinson (hereinafter "ALJ Robinson") conducted a hearing on October 12, 2011 (*Doc. 13-3* at 27-65). Plaintiff appeared at the hearing, represented by her former attorney Michelle Vaca, and testified (*id.* at 29, 31-57), as did Vocational Expert Michael L. Driscoll (hereinafter "VE Driscoll")[1] (*id.* at 58-64).

On January 10, 2012, ALJ Robinson issued a decision (*Doc. 13-3* at 12-22) finding that Plaintiff "has not been under a disability, as defined in the Social Security Act, from May 31, 2008, through the date of this decision."   *Id.* at 21.   On February 24, 2012, Plaintiff requested that the Appeals Council review ALJ Robinson's decision.   *Id.* at 7.   On February 21, 2013, the Appeals Council denied Plaintiff's request for review on the ground that there was "no reason under our rules to review the [ALJ]'s decision."   *Id.* at 2.   This decision was a final decision of the Commissioner.   Plaintiff appealed that decision to this district court (*Jacquez v. Colvin*, Civ.-13-383 SMV) and, on September 16, 2016, the decision was reversed and the case was

---

[1]  Although the hearing transcript identifies the VE as "Michael Vriscoll" (*Doc. 13-3* at 28), the VE's resume identifies him as "Michael Lee Driscoll" (*Doc. 13-6* at 16).

remanded to the agency for further proceedings.[2]   [*Doc. 13-14* at 3-17].   On December 10, 2014, after its receipt of the district court's decision, the Appeals Council issued a remand order that notified the not-yet-assigned ALJ that Plaintiff had filed subsequent DIB and Supplemental Security Income (hereinafter "SSI") applications on March 15, 2013;[3] consolidated those claims with Plaintiff's previous DIB claim; and directed the ALJ to offer Plaintiff an opportunity for a new hearing to address additional evidence, to take any necessary additional action, and to issue a new decision.   *Id*. at 20.

Pursuant to that remand order, another hearing was held on October 20, 2015 (*Doc. 13-13* at 2-31) by ALJ Ann Farris (hereinafter "ALJ Farris"), at which Plaintiff again appeared, represented by her current attorney, Michael Armstrong, and testified (*id*. at 4, 8-26).   Also appearing and testifying at the hearing was Vocational Expert Karen Nixon Provine (hereinafter, "VE Provine").   *Id*. at 4, 27-30.   On December 18, 2015, ALJ Farris issued a decision finding that Plaintiff "was not under a disability . . . at any time through December 31, 2013, the date last insured" for purposes of her DIB claims.   [*Doc. 13-12* at 15].   However, ALJ Farris also determined that Plaintiff became disabled "[b]eginning on September 9, 2014, the date [her] age

---

[2] In his decision remanding Plaintiff's case, Judge Vidmar ruled against Plaintiff on the issues of whether ALJ Robinson's RFC and credibility analysis were supported by substantial evidence (*see Doc. 13-14* at 12, 17), but found inconsistency in VE Driscoll's testimony that Plaintiff could perform three "light" jobs, despite her RFC's restriction to "sedentary walking/standing" (*id*. at 11).

[3] Plaintiff's 2013 SSI and DIB applications may be found in *Doc. 13-19* at 6-11 and 12-13, respectively).

category changed."[4]   *Id*.   Plaintiff did not file exceptions to ALJ Farris' decision, and the Appeals Council did not assume jurisdiction within sixty days.   Therefore, pursuant to 20 C.F.R. § 404.984(d), the ALJ's decision became the final decision of the Commissioner.   On April 11, 2016, Plaintiff filed her complaint in this case.   [*Doc. 1*].

## II.   Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue*,   522 F.3d 1093, 1096   (10th Cir. 2008)   (citing   *Hamilton v. Sec'y of Health & Human Servs.*,   961 F.2d 1495, 1497–98   (10th Cir. 1992)).   If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief.   *See Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).   A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner.   *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted); *Doyal*, 331 F.3d

---

[4] Plaintiff was born on September 10, 1964 and, therefore, actually turned 50 on September 10, 2014.   *See, e.g.*, [*Doc. 13-19* at 6; *Doc. 13-20* at 2].

at 760 (citation and quotation marks omitted).   An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."   *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted).   While a court may not re-weigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."   *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citations omitted).   "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence."   *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

### III.   Applicable Law and Sequential Evaluation Process

For purposes of DIB and SSI, a person establishes a disability when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).   In light of this definition for disability, a five-step sequential evaluation process (hereinafter "SEP") has been established for evaluating a disability claim.   20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the SEP, the claimant has the burden to show that: (1) the claimant is not engaged in "substantial gainful activity;" and (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to

last for at least one year; and either (3) the claimant's impairment(s) meet(s) or equal(s) one of the "Listings" of presumptively disabling impairments; or (4) the claimant is unable to perform his or her "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261. At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy, considering his or her residual functional capacity (hereinafter "RFC"), age, education, and work experience. *Grogan*, 399 F.3d at 1261.

## IV.   Plaintiff's Age, Education, Work Experience, and Medical History; and the ALJ's Decision

Plaintiff was born on September 10, 1964 (*Doc. 13-7* at 2), and was 44 years old on May 31, 2008, the alleged date of disability onset. Plaintiff turned 50 years old on September 10, 2014. For the purposes of her disability claims, Plaintiff was considered to be a "younger person" until she turned 50, and was thereafter considered to be "closely approaching advanced age."[5] Plaintiff reads and understands English, but has only a ninth grade education. [*Doc. 13-8* at 2, 7]. Prior to filing her disability claims, Plaintiff had worked intermittently as a waitress, a cashier, and a housekeeper. [*Doc. 13-13* at 8-9, 28]. She last worked on November 16, 2008, when her teller

---

[5] *See* 20 C.F.R. §§ 404.1563(c) and 416.963(c) (defining a "younger person" as "under age 50"), but also noting that younger persons that are age 45-49 may, in some circumstances, be "more limited in their ability to adjust to other work than persons who have not attained age 45." As such, the Medical-Vocational Rules include "Younger individual age 45-49" as a separate category. *See, e.g.*, Rule 201.17 (20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.17). A person who is age 50-54 is considered to be "closely approaching advanced age," and the Administration will consider that people in that age range who have both a severe impairment and limited work experience may be seriously affected in their ability to adjust to other work. 20 C.F.R. §§ 404.1563(d) and 416.963(d).

job at a race track job terminated due to the end of horse racing season.   [*Doc. 13-8* at 3].   In her

2013 DIB and SSI applications, Plaintiff claimed disability due to "Bilateral Knee Instability,

Degenerative Joint Disease, Left Leg Shorter than the Right Leg[,] Acid Reflux, Hernia,

Anemia[;] Hip Dysplasia, [and] Chronic Back Pain."   [*Doc. 13-20* at 7].

      Plaintiff's medical records include:   treatment record, dated February 22, 2013, from

Andrew J. Veitch, M.D. (*Doc. 13-22* at 2-3); outpatient treatment records for the periods from

October 3, 2011 to February 27, 2013 (*id*. at 9-28), from May 18, 2012 to September 12, 2013

(*Doc. 13-23* at 5-44), from September 4, 2013 to September 10, 2015 (*Doc. 13-24* at 10-21), and

from October 1, 2013 to October 6, 2015 (*Doc. 13-25* at 3 through *Doc. 13-27* at 19), from the

University of New Mexico Health Sciences Center; medical assessment of work-related abilities,

physical (*Doc. 13-22* at 29) and non-physical (*id* at 30), both dated May 1, 2013, from Dr. Andrew

Veitch; medical assessments of work-related abilities, physical, dated September 3, 2013

(*Doc. 13-24* at 6) and September 7, 2013 (*id.* at 3), listing 12.04 assessments, dated September 3,

2013 (*id*. at 7) and September 7, 2013 (*id*. at 4), and listing 12.06 assessment, dated September 3,

2013 (*id*. at 8) from Grace Mishkin, CFNP; and medical assessment of work-related abilities,

physical, dated March 25, 2014, from Lesley Toser, DPT (*id*. at 5).   Where relevant, Plaintiff's

medical records are discussed in more detail below.

      At step one of the five-step evaluation process, ALJ Farris found that Plaintiff had not

engaged in substantial gainful activity since the alleged onset date of disability.   [*Doc. 13-12*

at 8].   At step two, she found that Plaintiff has had the following severe impairments since

May 31, 2008:   "scoliosis, anxiety, patellafemoral[6] instability, leg-length discrepancy, and a

history of congenital hip dislocation."   *Id.*   At the third step, ALJ Farris found that Plaintiff "has

not had an impairment or combination of impairments that meets or medically equals the severity

of   one   of   the   listed   impairments   in   20 CFR   Part 404,   Subpart P, Appendix 1

(20 CFR 404.1520(d), 404.1525 and 404.1526)."   *Id.* at 9.   In so finding, ALJ Farris considered

Listing 1.02 (Major Dysfunction of a Joint(s)), and concluded that:   (1) because imaging of

Plaintiff's hip "has revealed no joint-space narrowing, bony destruction or ankylosis"; and

(2) because, "examiners regularly reported good range of motion [in Plaintiff's knees], despite

complaints of pain," and Plaintiff "ambulates minus any assistive device beyond knee braces." her

hip and knee impairments were not of listing-level severity.   *Id.*

Prior to step four, ALJ Farris determined that, since May 31, 2008, Plaintiff had the RFC

to:

> perform sedentary work (lift 10 pounds occasionally, stand/walk for two hours out
> of an eight-hour day and sit for six hours out of an eight-hour day) as defined in
> 20 CFR 404.1567(a) and 416.967(a) except she cannot kneel, crouch or crawl.
> She can occasionally climb, balance and stoop.   [Plaintiff] can make simple
> decisions in a work environment with few changes.

---

[6] "The patellofemoral joint is where your patella (kneecap) and femur (thigh bone) meet at the front of your
knee.  The underside of your kneecap sits in a groove within your thigh bone called the patellofemoral groove.
Within this groove, the kneecap mostly moves lengthwise, but it has some side-to-side movement and can tilt and
rotate as well."  Medical Definition The Patellofemoral Joint, https://www.verywell.com/what-is-the-patellofemoral-joint-3120364?utm_term=patellofemoral+knee+pain&utm_content=p1-main-3-title&utm_medium=sem&utm_source=google_s&utm_campaign=adid-f25b89eb-cb6d-491f-92ba-20ca5b108574-0-ab_gsb_ocode-34414&ad=semD&an=google_s&am=broad&q=patellofemoral+knee+pain&o=34414&qsrc=999&l=sem&askid=f25b89eb-cb6d-491f-92ba-20ca5b108574-0-ab_gsb (site last visited March 21, 2017).

*Id*.  In support of this RFC assessment, ALJ Farris found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  *Id*. at 12.

At step four, ALJ Farris found that Plaintiff "has been unable to perform any past relevant work" since May 31, 2008, because the requirements of Plaintiff's previous work exceed her present RFC.  *Id*. at 13.  At step five, ALJ Farris found that, prior to September 9, 2014, jobs existed in significant numbers in the national economy that Plaintiff could have performed.  *Id*. at 14.  ALJ Farris indicated that, "if [Plaintiff] had the [RFC] to perform the full range of sedentary work, a finding of 'not disabled' would be directed by Medical-Vocational Rule 201.19," but that Plaintiff's ability to perform sedentary work "was impeded by additional limitations."  *Id*.  Therefore, ALJ Farris relied on VE Provine's testimony that an individual with Plaintiff's work history, education, and RFC could have performed the following representative jobs:  stuffer (DOT 731.685-014), table worker (DOT 739.687-182), and addresser (DOT 209.587-010).  [*Doc. 13-12* at 14].  Based on that testimony, ALJ Farris concluded that a finding of "not disabled" was appropriate for the period prior to September 9, 2014.  *Id*.  However, ALJ Farris then found that, "[b]eginning on September 9, 2014, the date [Plaintiff]'s age category changed, considering [Plaintiff]'s age, education, work experience, and [RFC], there are no jobs that exist in significant numbers in the national economy that she could perform."  *Id*. at 15.

# V.   Analysis

In her current motion to remand, Plaintiff argues that ALJ Farris:  (1) failed to provide specific, legitimate reasons for rejecting the medical opinions of treating physician, Andrew Veitch, M.D.; (2) breached her administrative duty to develop the record concerning whether Plaintiff has additional mental health impairments; and (3) failed to properly analyze VE Provine's testimony and, therefore, her step five determination is not supported by substantial evidence.   [*Doc. 21* at 2].   Defendant responds that:   (1) ALJ Farris reasonably weighed Dr. Veitch's opinion; (2) the record regarding Plaintiff's mental condition was adequately developed; and (3) ALJ Farris appropriately relied on VE Provine's testimony.   [*Doc. 23* at 5, 8, and 10, respectively].   In reply, Plaintiff argues that:   (1) Defendant failed to respond to the arguments in her motion and, instead, offered impermissible *post hoc* explanations; (2) ALJ Farris relied on medical sources that never offered "true medical opinions"; (3) that Defendant is "imputed with the knowledge" that VEs have been providing jobs numbers that are unreliable; and (4) the case should be remanded for an immediate award of benefits.[7]   [*Doc. 24* at 2, 3, 4, and 5, respectively].

---

[7] The Court declines to consider arguments (2) through (4) in Plaintiff's reply, as they were made for the first time in that document.   *See Forest Guardians v. U.S. Forest Serv.*, No. CIV.05 0372 JB/DJS, 2006 WL 4109660, at *3 (D.N.M. Aug. 15, 2006) (unpublished) ("The Tenth Circuit has repeatedly held that waiting to raise an issue until a reply brief-. . . -is not allowed").

### A.   ALJ Farris' Consideration of the Opinion of Dr. Veitch

In her analysis of Plaintiff's RFC, ALJ Farris considered, among other medical records and opinions, a check-box form filled out by treating physician, Andrew Veitch, M.D. on May 1, 2013 (*Doc. 13-22* at 29-30) and, ultimately, gave that opinion "limited weight."   [*Doc. 13-12* at 11]. ALJ Farris indicated that, on "a form provided by [Plaintiff]'s representative," Dr. Veitch "list[ed] functional limitations that are out of proportion to the diagnostic evidence, the examining sources who follow[,] and [Plaintiff's activities of daily living] as reported to Dr. [Karl] Moedle."   *Id*.   In addition, she noted that "although [Dr.] Veitch's treatment notes confirm crepitus and arthritic characteristics in [Plaintiff]'s knees, they do not emphasize pain.   Rather, [Plaintiff] walks without an assistive device in no obvious distress."   *Id*.   ALJ Farris also noted that "[Dr.] Veitch discouraged [Plaintiff] from having surgery, which appears contrary to an assessment that her condition is so severe she would be markedly limited in completing work activities."   *Id*. Plaintiff argues that "ALJ Farris failed to perform the requisite 'controlling weight' analysis, instead collapsing the two-step [treating physician] inquiry into a single step," and that this was error, citing *Chrisman v. Colvin*, 531 F. App'x 893 (10th Cir. August 21, 2013) (unpublished). [*Doc. 21* at 16].   Plaintiff also argues that ALJ Farris failed "to provide specific, legitimate reasons for rejecting the opinion of Dr. Veitch."   *Id*.   The Court is not persuaded.

Pursuant to Soc. Sec. Reports 96-2p, at *1, "controlling weight" must be given to treating acceptable source opinions that are "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and are "not inconsistent with the other substantial evidence in the case record."   The unpublished case cited by Plaintiff, *Chrisman*, recognized the standard, as it was described in *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011), which indicated that

an ALJ's determination regarding the weight to be accorded to an opinion by a treating acceptable source is "a sequential two-step inquiry," where the first step is determining whether the opinion at issue meets the standard for "controlling weight," and if not, "the ALJ must make clear how much weight the opinion is being given."   Plaintiff would have this Court rigidly apply that standard and reverse ALJ Farris' decision on the ground that she did not specifically state that Dr. Veitch's opinion was "*not* entitled to controlling weight."   However, neither *Krauser* nor *Chrismon* appears to support such a rigid application of the rule.   In *Krauser*, the ALJ concluded that the treating physician failed to satisfy the conditions for controlling weight, and rejected it solely on that basis.   *Krauser*, 638 F.3d at 1331.   The court first determined the ALJ's conclusion to be "flatly incorrect."   *Id*.   However, despite the ALJ's incorrect conclusion regarding controlling weight, the court continued, noting that, "[e]ven leaving aside the noted complications with the grounds cited for that decision, the ALJ's assessment of [the doctor's] opinion is patently inadequate for the distinct reason that it ends halfway through the required two step analysis," because the ALJ failed to both assign weight to the opinion and to state the reasons for the weight given.   *Id*.   As such, the *Krauser* court found it necessary to remand because it could not "meaningfully review the ALJ's determination absent findings explaining the weight assigned to the treating physician's opinion."   *Id*. (quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003)).

In *Chrismon*, 531 F. App'x at 901, the ALJ's entire stated reason for rejecting a treating physician's opinion was that "longitudinal mental health records were not submitted as evidence on this record," such that "the basis of th[e] opinion, if any, cannot be assessed or reviewed." Again, the court noted that it "could perhaps read" the ALJ's stated reason "as an implicit finding"

that the opinion did not satisfy the controlling weight criteria, yet there were two problems with doing so.  *Id*.  The first reason was the ALJ's failure to analyze the amount of weight to which the opinion was entitled.  *Id*.  The second reason was that the court found that the record did not support the single stated reason for discounting the opinion, since "longitudinal treatment notes underlying the treating source opinion" had, in fact, been submitted and accepted.  *Id*.

In the present case, a finding that Dr. Veitch's opinion was not entitled to controlling weight, though not specifically expressed, is clearly implied by ALJ Farris' assignment of "limited weight" to the opinion, along with the specific reasons she gave for that weight.  Under these circumstances, the Court is unaware of any cases that would require remand.  Moreover, this Court is not inclined to construe the law in such a way that it requires "unwarranted remands needlessly prolonging administrative proceedings."  *Fischer-Ross v. Barnhart*, 431 F.3d 729, 730 (10th Cir. 2005).  The failure to specifically state that a treating physician's opinion is not entitled to controlling weight is an example of "harmless error" that should not, by itself, require remand.

However, Plaintiff also argues that "ALJ Farris failed to cite any contrary evidence or supply any specific references to the evidence of record that would tend to indicate Dr. Veitch's assessment was 'out of proportion,'" and that, "[a]s such, this Court is unable to review ALJ Farris's conclusions for substantial evidence." [*Doc. 21* at 17] (citations omitted).  Again, the Court disagrees.  First, it is up to this Court to determine whether or not it is able to effectively review an ALJ's decision.  In addition, contrary to Plaintiff's assertion, ALJ Farris did, in fact, cite evidence and give reasons regarding why she considered Dr. Veitch's opinion to be "out of proportion."  Specifically, ALJ Farris noted that Dr. Veitch had opined Plaintiff's "ability to complete a normal work week without interruption from pain or fatigue [to be] markedly limited,"

13

then indicated that Dr. Veitch's "treatment notes . . . do not emphasize pain," and that Dr. Veitch had "discouraged [Plaintiff] from having surgery."   [*Doc. 13-12* at 11].   Plaintiff calls these findings "simply false" (*Doc. 21* at 18), then picks out every mention of pain or discomfort that appear in Dr. Veitch's notes (*id*. at 18-19).   Unfortunately, what Plaintiff is asking this Court to do is to "reweigh" the evidence and to draw a different conclusion from it than did ALJ Farris.   This is neither allowed (*see, e.g.*, *Grogan*, 399 F.3d at 1262 (reviewing courts may not reweigh the evidence)), nor warranted in this case.   Having reviewed Dr. Veitch's notes, this Court cannot conclude that ALJ Farris' findings regarding them are either false or unsupported by substantial evidence.   "In reviewing the ALJ's decision, 'we neither reweigh the evidence nor substitute our judgment for that of the agency.'"   *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir.1991)).   Thus, an ALJ's findings may not be reversed simply because two inconsistent conclusions may be drawn from the same evidence (*see, e.g., Lax*, 489 F.3d at 1084), nor does a court have to "agree" with an ALJ's findings to determine that they are supported by substantial evidence (*Hoyl v. Babbitt*, 129 F.3d 1377, 1383 (10th Cir. 1997) (even though court "may not agree" with administrative agency's findings, they may not be set aside "if they are supported by substantial evidence")).

In any event, the evidence cited by Plaintiff from her medical records as supportive of Dr. Veitch's May 1, 2013 opinion is more supportive of ALJ Farris' conclusion that the records do not "emphasize pain," than contrary to it.   Out of nine treatment notes cited by Plaintiff as support

for Dr. Veitch's "marked" limitation of Plaintiff's work functions, only one is actually a treatment note written by Dr. Veitch, and one is a citation to his opinion itself.   [*Doc. 21* at 18-19].   The first is a note by David A. Rust, M.D.[8] from a November 13, 2009 examination, in which he noted in "History," that Plaintiff "states she has pain in the bilateral hips and bilateral knees," and reported "some generalized ligamentous laxity and pain and aching in her hips," but had "never been evaluated for any of these problems prior to this."   [*Doc. 13-9* at 25].   On examination, Plaintiff had "some tenderness along the sacroiliac joint in the back and along the hip, but she has good range of motion in the hip and only mild discomfort with extremes of internal and external rotation," and "no axial grinding pain."   *Id*.   Plaintiff had "discomfort" with lateral patella subluxation.   *Id*.   Dr. Rust indicated that "[w]e would like to try to treat this conservatively with physical therapy, possibly McConnel taping, and/or bracing, as well as antiinflammatories for her hip pain," that he would see her back in two to three months, and would then "obtain x-rays of [her] lumbar spine and the pelvis and bilateral hips."   *Id*.

On January 8, 2010, Plaintiff was seen by John J. Jasko, M.D., who was listed as "House Officer" in Orthopedics, who indicated that Plaintiff "used to wear a lift in her shoe but does not any longer and has some hip and SI (sacroiliac) joint area pain but no radicular symptoms."   *Id*. at 24.   Dr. Jasko indicated that, on examination, Plaintiff had "full motion of her knees," and "pain with the extremes of [hip] motion."   *Id*.   Dr. Jasko indicated that Plaintiff "needs physical

_____

[8] Dr. Rust performed the exam as the "House Officer, Department of Surgery," and the notes list Dr. Veitch as the "Attending Physician, Department of Orthopedics."   [*Doc. 13-9* at 26].

therapy" as "[s]he has not had a good non-operative trial in treatment for her conditions consisting of her hip SI joint and patellofemoral instability."   *Id*.   He prescribed "Shields braces," and wanted to see her back in two to three months for x-rays of "her anatomic alignment."   *Id*.   On June 10, 2010, Plaintiff was seen by John P. Mann, M.D. (also a "House Officer" in Orthopedics), who reported that Plaintiff said "her knee caps bother her really only about 2 times a year, but she has pain quite a bit," including "going up and down stairs," but that "she has used braces which gave her some relief," though she reported having gone through "6 weeks of physical therapy with no help."   *Id*.   Dr. Mann noted that "her ligamentous exam is normal," and "[f]ull-length x-ray shows overall normal mechanical alignment of the coronal plane."   *Id*.   Dr. Mann stated that a "shoe lift for leg length discrepancy" would be ordered, as well as "bilateral MRIs of her knees."   *Id*.

The next three records cited by Plaintiff (*Doc. 21* at 19) relate to "Euflexxa injections" in Plaintiff's knees given her by Carina S. Pierce, PA-C on May 11, 18, and 25, 2012.   [*Doc. 13-23* at 13, 7, and 5, respectively].   On May 11, 2012, Ms. Pierce indicated that Plaintiff "was referred by Dr. Veitch" for the injections, and that Plaintiff "ha[d] never had them before but looks forward to having them and getting relief of her arthritic pain," which Plaintiff rated as three out of ten.   *Id*. at 13.   Plaintiff had "good range of motion in both knees, and had "no other complaints."   *Id*. Plaintiff "tolerated [the injections] well."   *Id*.   On May 18, 2012, Plaintiff reported that she had "not noticed any difference," that "[s]he looks forward to continuing," and that "she has no other complaints."   *Id*. at 7.   Ms. Pierce noted that Plaintiff's knees [we]re stable."   *Id*.   However, Plaintiff was noted to be "having pretty significant pain after this injection today on the right knee," which was wrapped with an ice bag, and Plaintiff "was able to ambulate out."   *Id*.   On

May 25, Plaintiff reported "having some continued achiness," and rated her pain at six out of ten, but again had "no other complaints."   *Id*.   Her knees were once again "stable" and had "good range of motion," and Plaintiff again tolerated the injection well.   *Id*.   Plaintiff was to return back to Dr. Veitch for reevaluation, and Ms. Pierce indicated she would be "happy to see her back on an as needed basis."   *Id*.

Dr. Veitch saw Plaintiff on February 22, 2013 and indicated that her "chief complaint" was both "[b]ilateral knee patellofemoral instability with degenerative joint disease," and "[l]eg length discrepancy."   *Id*. at 9.   Dr. Veitch noted that an attempt was made to treat the patellar instability and degenerative joint disease with Euflexxa injections "which have failed to offer her pain relief. She has instability a few times a year but has chronic daily pain.   Her knee braces have helped her, although not totally relieved her symptoms."   *Id*.   Plaintiff reported that the limb length discrepancy "causes her back pain," and Dr. Veitch noted that, on examination, Plaintiff "[wa]s in no obvious distress," but "does walk with a slow gait which is antalgic."   *Id*.   Dr. Veitch noted having had "a pleasant discussion with the patient today concerning her treatment options.   I think her options are learn to live with her disability and use her braces or undergo a major surgery," which "will probably not address her degenerative joint disease."   *Id*. at 10.   He noted that "[a]t this point, the patient states that she is unwilling to undergo surgical management.   This is not an unreasonable decision as I think this would be complicated and may not offer her complete relief." *Id*.   Dr. Veitch indicated that he, too, would be "happy to see [Plaintiff] back on an as needed basis."   *Id*.

The last record Plaintiff cites as evidence that ALJ Farris's findings are "simply false" (*Doc. 21* at 18), is a "Final Report" by internist George D. Comerci, Jr., M.D. on October 6, 2013

(*Doc. 13-23* at 23-27).   Dr. Comerci indicated that Dr. Veitch had referred Plaintiff "to the Pain

Consultation and Treatment Center" for "[b]ack, neck pain and knee pain."   *Id*. at 23.   Plaintiff

reported to Dr. Comerci that "[s]he has been using braces on her knees for sometime [sic] with

some relief"; she had physical therapy, but was "not sure if it helped"; had been offered operative

and nonoperative interventions and had "elected to try Euflexxa," which "offered some relief, but

not much'"; and, while Dr. Veitch "did discuss the possibility major surgery . . .[h]e felt that this

would not deal with degenerative joint disease," and Plaintiff "opted not to pursue this."   *Id*.

Plaintiff also reported that her "scoliosis has resulted now in very significant back pain . . . which

almost rivals her knee pain," and that "[s]he cannot afford the insert into the right shoe, which is

troubling because the leg length discrepancy, she feels, is making the back pain worse."   *Id*.

at 23-24.   Plaintiff "describe[d] the pain as achy, sometimes sharp," and "rate[d] it as a 5 now, but

it can go as high as an 8-10 if she exerts herself by being more active with doing anything."   *Id*.

at 24.   "Pain is up and down the back.   It is also in the knees as mentioned.   The neck pain is

'driving [her] crazy," and "[s]he reports that she is unable to sleep given the pain waking her up."

*Id*.   Dr. Comerci indicated that Plaintiff was "a very pleasant lady in no acute distress who was

quite anxious."   *Id*. at 25.   He further noted "exquisite pain of the cervical paraspinous

musculature," "distinct and very significant myofascial trigger points involving the superior

border of the trapezius, particularly on the left.   Range of motion of the neck is normal but it does

reproduce pain particularly in the posterior cervical region," "[t]horacic spine demonstrates full

range of motion," and "[p]alpation of the thoracic spine was unremarkable, but palpation of the

lumbar spine did, again, show paraspinous muscular tenderness . . . consistent with myofascial

pain."   *Id*.   With respect to Plaintiff's "upper extremities," Dr. Comerci noted "well developed

musculature and joints with no pathology noted.   She had full range of motion of all major joints.

No arthropathy noted." *Id*.   Regarding her "lower extremities," Plaintiff "had normal hips,"

"clearly had bilateral grind sign when examining the knees with some instability but not

inflammatory changes, effusion, etc.   Ankles were normal." *Id*.   On neurological examination,

Plaintiff's upper extremities "had excellent strength, reflexes and sensory exam," and her lower

extremities "had excellent motor strength with normal sensation, reflexes.   Gait was slightly

antalgic and stiff." *Id*. at 26.   Among other things, Dr. Comerci recommended that Plaintiff stop

taking cyclobenzaprine, because of its "significant drug interaction with amitriptyline,"[9] increase

her amitriptyline dosage and begin taking baclofen, and have physical therapy and "[a]ggressive

myofascial therapy including trigger point therapy in the neck region, etc." *Id*.

At best, the evidence presented by Plaintiff indicates that she has clear anatomical

disorders that cause her some pain, which is sometimes high, but typically no more than moderate.

Her ability to ambulate is only mildly affected, and both her functionality and pain are alleviated

somewhat when she wears knee braces.   Although Plaintiff has some back pain, it has not been

the focus of her visits to most medical practitioners, nor did any of these providers indicate that

shoulder functionality is a significant issue.   In fact, virtually every provider found normal range

of motion in Plaintiff's knees, which are her primary impairment, and recommended fairly

conservative treatments.   This evidence, even if it can be attributed to Dr. Veitch himself, simply

---

[9] "Amitriptyline is used to treat symptoms of depression."   https://medlineplus.gov/druginfo/meds/a682388.html (site last visited March 22, 2017).

does not support Dr. Veitch's extreme functionality limitations.   Therefore, the Court cannot conclude that ALJ Farris erred in her assignment of "limited weight" to Dr. Veitch's May 1, 2013 opinion.

### B.   ALJ Farris' Duty to Develop a Mental Health Record

Plaintiff argues that ALJ Farris "breached her administrative duty to develop the record regarding Plaintiff's mental health issues, which she contends raised "more than a 'reasonable possibility' that [she] suffered from limitations stemming from depression, anxiety, and pain disorder."   [*Doc. 21* at 21].   Defendant responds that "[a]n ALJ need only develop the record . . . when the existing record is inadequate for the ALJ to make a determination regarding the claimant's disability," and that Plaintiff's mental status was adequately accounted for by Krishna Chari, Psy.D., Plaintiff's treating therapist.   [*Doc. 23* at 8-9] (relying, in part, on 20 C.F.R. § 404.1512(e),[10] which provides that the agency "will not request a consultative examination until we have made every reasonable effort to obtain evidence from your own medical sources"; and § 404.1519a(b),[11] which provides that consultative examinations may be ordered by the agency "to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim").   Thus, the Tenth Circuit holds that "the claimant has the burden to make sure there is, in the record, evidence sufficient to suggest a reasonable possibility that a severe impairment exists.   When the claimant has satisfied his or

---

[10] This regulation, which applies to DIB claims under Title II, is identical to the Title XVI provision applicable to SSI claims, 416.912(e).

[11] This regulation is identical to 416.919a, which applies to Title XVI claims.

her burden in that regard, it then, and only then, becomes the responsibility of the ALJ to order a consultative examination *if such an examination is necessary or helpful* to resolve the issue of impairment."   *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997) (emphasis added).

In this case, it does not appear that additional evidence regarding Plaintiff's mental health was either necessary or would have been particularly helpful to resolving the issue of her impairments.   First, at step two of the SEP, ALJ Farris found that Plaintiff has a "severe impairment" consisting of "anxiety."   [*Doc. 13-12* at 8].   ALJ Farris also had detailed notes from Dr. Chari, an acceptable medical source who specializes in mental health issues, as well as from other acceptable sources who, although not specialists in mental health, do regularly treat such conditions and/or make referrals to mental health specialists when a need to do so is perceived.

ALJ Farris summarized Dr. Chari's interactions with Plaintiff, as follows:

After her second meeting with [Plaintiff], Krishna Chari, Psy.D. described [Plaintiff] as restless but with a normal mental status and no acute psychosis [citing *Doc. 13-25* at 33].   By January 2014, [Plaintiff] stopped seeing [Dr.] Chari [citing *id*. at 31] but, persuaded by Dr. Comerci, resumed again in May [2015]. [Dr.] Comerci considered it "essential" that she continue to see Dr. Chari "given the fact that she is psychologically doing so much better" [citing *id*. at 22].   In July 2015, [Dr.] Chari commented that he [sic] had not seen the claimant for almost a year and questioned whether she actually needed or desired treatment given several cancellations and no-shows.   They discontinued any regular appointments and settled on an as-needed basis [citing *id*. at 15].   I accord great weight to Dr. Chari and, although her notes indicate only mild psychological issues, I have also given [Plaintiff] some benefit of the doubt and limited her to simple work.

[*Doc. 13-12* at 12].

In August 2013, Dr. Comerci, who saw Plaintiff for pain management at Dr. Veitch's request, noted that Plaintiff was "extraordinarily discouraged by her situation," "reports that she is anxious all the time," "is extraordinarily frustrated," and "thinks that she is also starting to get depressed," although "[s]he is well supported by family members and boyfriend." [*Doc. 13-23*

at 24].   He indicated that Plaintiff's affect was anxious, and "[m]ood was quite worried," but that

her behavior was "normal."   *Id*. at 26.   Dr. Comerci also indicated, as one of his "impressions,"

that one of Plaintiff's issues was "Depression/anxiety."   *Id*.   He also recommended that Plaintiff

increase her medication for depression, amitriptyline, and stop taking another drug that

significantly interacted with amitriptyline.   [*Doc. 13-23* at 26].   However, Plaintiff was

subsequently told by Dr. Comerci "that she must stop the amitriptyline and no longer use it

because it is causing electrical problems with the heart."   [*Doc. 13-25* at 31].   Dr. Comerci

indicated at the same visit that he was "disappointed that [Plaintiff] does not want to continue with

clinical psychology with Dr. Chari," noting:

> [Plaintiff] is really almost demanding to know what I am going to do about her
> pain, and I am under the impression that she is not appreciating the fact that coping
> skills are going to be extraordinarily important for her lifelong dealing with this
> pain.   I encouraged her to return [to Dr. Chari].

*Id*.

At the end of the 2015 hearing, ALJ Farris asked Plaintiff's counsel to get the records from

Plaintiff's psychologist, Dr. Chari, stating, "I have that letter, but it's kind of been worthless," and

"[d]oesn't really have any psychological diagnosis even."   [*Doc. 13-13* at 30 (referring to

Dr. Chari's September 10, 2015, one-page, letter in *Doc. 13-24* at 21)].   ALJ Farris indicated that,

once she had Dr. Chari's records, "then I'll look at that and then I may want to send [Plaintiff] for

a consultative evaluation depending on whether that's sufficient.   But, otherwise then once I get

those records . . . then I'll issue a written decision."   *Id*. at 30-31.   At this time, which was

approximately five months after Plaintiff had essentially terminated regular treatment by Dr. Chari

(*Doc. 13-25* at 15), Plaintiff's counsel did not attempt, in any way, to convince ALJ Farris that

available records regarding Plaintiff's mental issues were insufficient, or that a psychological

consult should be ordered.  *Id*.  Dr. Chari was a treating acceptable mental health source, to whom ALJ Farris accorded "great weight."   Dr. Chari became Plaintiff's treating psychologist at the behest of another treating physician, Dr. Comerci, based on his evaluation that Plaintiff was "quite anxious."  [*Doc. 13-23* at 25].  Dr. Comerci later "encouraged" Plaintiff to return to Dr. Chari.

Plaintiff asserts that "[h]ad ALJ Farris complied with her duty to develop the administrative record, the nature and extent of [Plaintiff]'s psychological conditions would have been explored by a qualified medical professional."  [*Doc. 21* at 22].  Indeed, Dr. Chari is just such a "qualified medical professional" who provided treatment records in which she "explored" Plaintiff's psychological complaints.  ALJ Farris did not, as Plaintiff contends "[see] fit to play doctor by 'assessing' [Plaintiff]'s psychological limitations herself, without *any* supporting evaluations" (*id*.); rather, ALJ Farris relied on a treating acceptable source, to whose opinion of "mild psychological issues" she added a limitation to "simple work," based on giving Plaintiff "some benefit of the doubt" regarding her claimed impairments (*Doc. 13-12* at 12).  It is well established that an ALJ does not err in "tempering" medical opinions for a claimant's benefit. *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) ("if a medical opinion adverse to the claimant has properly been given substantial weight, the ALJ does not commit reversible error by electing to temper its extremes for the claimant's benefit").  The Court finds this contention by Plaintiff to be without merit.

### C.   The ALJ's Step Five Determination

Plaintiff asserts that VE Provine's testimony is insufficient to support ALJ Farris' step five determination that there are sufficient numbers of jobs that Plaintiff could perform, because the numbers to which VE Provine testified are for "groupings" of jobs, rather than for the individual jobs that Ms. Provine testified Plaintiff could perform.   [*Doc. 21* at 24-25].   Plaintiff's counsel has raised this argument before.   *See, e.g., Romero v. Berryhill*, CV-16-121-LAM, *Doc. 19* at 20-24; *Michelback v. Colvin*, CV-14-1082-LAM, *Doc. 25* at 21-26; *Young v. Colvin*, CV-14-346-WPL, Doc. 18 at 23-27   Plaintiff's counsel bases this argument, in part, on testimony by a different VE in an unrelated case.[12]   *See Id.* at 24 (citing to "Exhibit A to this Motion," which is *Doc. 21-1* at 1-25).   While the argument appears to have some facial merit, the Court is precluded from considering this issue because Plaintiff's counsel failed to raise it at the ALJ hearing.   Plaintiff was represented by her current counsel at the 2015 hearing, yet counsel not only failed to question VE Provine regarding the job numbers she gave or their origin, he offered no

---

[12] This transcript excerpt attached to Plaintiff's current motion is from an ALJ hearing in a case involving a claim by Nancy Valencia, wherein, the claimant was represented by Michael Armstrong, the ALJ was Ben Willner and the VE who testified was Thomas Greiner.  The document provided does not include the date of the hearing in Ms. Valencia's case.  However, Mr. Armstrong submitted the same transcript, on September 26, 2016, with his motion to remand in the *Romero* case, along with other documents that trace back to *Young v. Colvin*, CV-14-346-WPL, in which he also submitted the *Valencia* transcript, on October 6, 2014, in support of the same argument he makes here.  *See* [*Doc. 18*, and attached exhibits, in *Young*].  Suffice it to say that Plaintiff's counsel has been familiar with the argument for some time; at least a full year before he represented the Plaintiff in this case at the October 20, 2015 hearing.  In *Valencia*, which was apparently never appealed to this district court, Mr. Armstrong did what he should do here, which is to raise the issue through cross-examination.  See [Doc. 21-1 at 5-6, 18-24].  Based on his having asked the VE at the *Valencia* hearing about the very same issues, the ALJ in *Valencia* engaged in a great deal more questioning of the VE, and had him do further research while the hearing was in recess.  Because, however, Mr. Armstrong chose not to ask VE Provine similar questions, we do not know how, or if, her testimony or the ALJ's decision might have changed, had the issue been addressed.

objection to her testimony whatsoever.   [*Doc. 13-13* at 27-31].   An ALJ's duty to develop the record exists, even when a claimant is represented by counsel (*see, e.g.*, *Henrie v. U.S. Dep't of Health & Human Servs.,* 13 F.3d 359, 360-61 (10th Cir. 1993) (citation omitted) (also noting that "the duty is heightened when the claimant is unrepresented")).   However, "[t]he degree of effort required" in case development "varies from case to case."   *Rains v. Apfel*, 194 F.3d 1321, at *2 (10th Cir. October 7, 1999) (unpublished; citations omitted).

Despite Plaintiff's assertions, which are in any event based entirely on extraneous "evidence" submitted by her counsel, that the ALJ could not reasonably rely on VE Provine's "unreliable" testimony, there is absolutely no evidence in this record that VE Provine's testimony is not, in fact, accurate.   Where a claimant's counsel, who is well-versed regarding a potential challenge to a VE's testimony and the methodology used to determine jobs numbers, consciously chooses not to offer that challenge, the ALJ does not have a duty to interrogate the VE regarding her methods.

In *Glass v. Shalala*, 43 F.3d 1392, 1396 (10th Cir. 1994), the court rejected a plaintiff's claim that the ALJ "did not develop the record sufficiently to evaluate her pain," stating:

> We agree with [plaintiff] that every ALJ has "a basic obligation . . . to ensure that an adequate record is developed during the disability hearing consistent with the issues raised."   *Henrie v. United States Dep't of Health & Human Servs.*, 13 F.3d 359, 360–61 (10th Cir.1993).   This duty is not a panacea for claimants, however, which requires reversal in any matter where the ALJ fails to exhaust every potential line of questioning. *See id.* at 361 (noting that it is not the ALJ's duty to become claimant's advocate).

The *Glass* court also rejected the plaintiff's claim that she was denied due process by the ALJ's failure to allow her to cross-examine a VE who had testified at a hearing that plaintiff did not attend, noting that the ALJ had questioned plaintiff's counsel about the VE's statements at a

subsequent hearing and inquired whether he had any objection to the testimony.  *Id*.  Based on

counsel's statement that "he had no objections to the testimony and had nothing further for the

ALJ's consideration," the court concluded that the plaintiff "waived her right to cross-examine the

witness."  *Id*.

      In *Hawkins v. Chater*, 113 F.3d 1162 (10th Cir. 1997), the court relied on *Glass* in its denial

of a plaintiff's claim that the ALJ erred by failing to order a consultative examination, stating:

> When the claimant is represented by counsel at the administrative hearing, the ALJ
> should ordinarily be entitled to rely on the claimant's counsel to structure and
> present claimant's case in a way that the claimant's claims are adequately explored.
> Thus, in a counseled case, the ALJ may ordinarily require counsel to identify the
> issue or issues requiring further development.   In the absence of such a request by
> counsel, we will not impose a duty on the ALJ to order a consultative examination
> unless the need for one is clearly established in the record.

*Id*. at 1167-68 (citation omitted).  Finally, in *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir.

2008), in considering the claimant's assertion that the ALJ had failed to adequately develop the

record, the court stated that "[a]lthough the ALJ has the duty to develop the record, such a duty

does not permit a claimant, through counsel, to rest on the record--indeed, to exhort the ALJ that

the case is ready for decision--and later fault the ALJ for not performing a more exhaustive

investigation" (citation omitted).  The court then opined that doing so "would contravene the

principle that the ALJ is not required to act as the claimant's advocate in order to meet his duty to

develop the record," and noting that counsel's failure to even attempt to obtain the records

"suggest[s] that counsel has abandoned his role as advocate in favor of relegating that

responsibility to the ALJ."

      This Court is not inclined to find error in the ALJ's failure in this case to further interrogate

VE Provine regarding the methodology she used to obtain her jobs figures.  Doing so would

simply allow Plaintiff yet another hearing at which to delve into an issue that could either have

been resolved at the previous hearing, or, at least, would have been sufficiently developed for this

Court's appellate review.[13]   For these reasons, the Court finds this contention by Plaintiff to be

without merit.

---

---

[13] Plaintiff's additional argument, that ALJ Farris' failure to perform an analysis under *Trimiar v. Sullivan*, 966 F.2d 1326 (10th Cir. 1992) requires remand because "it is certainly questionable whether a total of 15,000 jobs in the national economy rises to the 'significant' level as defined in 42 U.S.C. § 423(d)(2)(A)" (*Doc. 21* at 23-24), is also without merit.   This was clearly not Plaintiff's principal argument about job numbers and, as Defendant points out, Plaintiff cites no authority that such job numbers are "insignificant."   [*Doc. 23* at 11].   Moreover, *Rogers v. Astrue*, 312 F. App'x 138, 142 (10th Cir. February 17, 2009) (unpublished), issued seventeen years after *Trimiar*, determined that 11,000 such jobs was "substantial evidence" on which an ALJ could rely.   In addition, *Trimiar* itself is not particularly supportive of Plaintiff's claims, since the court in that case determined that the VE's testimony that between 650 and 900 potential jobs existed in Oklahoma, was sufficient (966 F.2d at 1330), and noted both that it rejected the opportunity to draw a bright line establishing job numbers that are "significant," and that "[w]e need not strain at numbers in reaching our conclusion the ALJ's decision is founded on substantial evidence."   *Id*. at 1331-32. Finally, Plaintiff's counsel once again did not raise this issue at the hearing, and thereby deprived ALJ Farris and VE Provine of the opportunity to address this issue at the hearing, which might have resulted in the finding of several other jobs that Plaintiff could perform.

# VI.   Conclusion

For the reasons stated above, the Court **FINDS** that the Commissioner's decision should be **AFFIRMED**.

**IT IS THEREFORE ORDERED** that Plaintiff's ***Motion to Reverse and Remand for a Rehearing With Supporting Memorandum*** (*Doc. 21*) is **DENIED**.   A final order will be entered concurrently with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

*Lourdes A. Martínez*
_____
**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**